ROBERT H. STORZ, TRANSFEREE OF STORZ-WACHOB-BENDER CO., a dissolved corporation, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Storz v. Commissioner
Docket No. 8293-71.
United States Tax Court
T.C. Memo 1979-140; 1979 Tax Ct. Memo LEXIS 383; 38 T.C.M. (CCH) 629; T.C.M. (RIA) 79140; April 11, 1979, Filed Kent O. Littlejohn and David M. Pedersen, for the petitioner. Ronald M. Frykberg, for the respondent. FAY
SUPPLEMENTAL MEMORANDUM OPINION FAY, Judge: On April 26, 1977, this Court filed its opinion in this case, , and decision was entered in favor of petitioner on June 13, 1977. Upon appeal by respondent, the Eighth Circuit Court of Appeals reversed and remanded the case for further proceedings in this Court. . Storz-Wachob-Bender Co. ("SWB"), a corporation engaged in the investment banking business, sold its entire business to First Nebraska Securities, Inc. ("First Nebraska"), pursuant to a plan of liquidation under section 337. [1] At the time of the sale SWB had numerous uncompleted contracts for *384 the under-writing of securities, which contracts were transferred to, and completed by, First Nebraska, which received compensation therefrom upon completion. Respondent determined, based upon a detailed analysis made by First Nebraska subsequent to the purchase, that a total of $129,851.50 of the purchase price received by SWB represented an assignment of income from partial performance of services under the transferred underwriting contracts. We held that no portion of such purchase price represented an assignment of income since under the practice of the industry, due to material contingencies, SWB had not perfected its right to any income from its underwriting contracts prior to their completion. The Court of Appeals reversed, essentially on the grounds that even though the income had not "accrued" to SWB under the partially completed contracts, income had been "earned" with respect to SWB's partial performance of such contracts and that the amounts so earned were effectively "realized" by SWB as taxable income upon receipt of consideration therefor from First *385 Nebraska. See . The case was remanded for our determination of the portion of the purchase price received by SWB for its business which represented consideration for the partially completed contracts. Petitioner has filed a motion for a further hearing "for the admission of further evidence bearing upon the question as to what value, if any, [the] partially completed underwriting transactions had at the time of the sale of the business * * *." Such motion is hereby denied since petitioner at the original trial of this case had ample opportunity to, and did in fact, introduce substantial testimony and documentary evidence specifically presenting his case as to this very question. Respondent has filed a motion requesting that we sustain his original determination that the amount paid for the partially completed contracts was $129,851.50. Respondent's motion is hereby denied, based upon our determination as set forth in this supplemental opinion. Reference is made to our original opinion for a more complete statement of the basic facts concerning the transaction between SWB and First Nebraska. *386 Such additional facts as are relevant to our determination on remand are set forth in this supplemental opinion. When First Nebraska purchased the business of SWB it paid an amount equal to the book value of SWB's net assets plus an agreed sum of $230,000. The purchase agreement did not specify for what this additional sum was being paid. The agreement did provide, however, that the sum was to be reduced by $16,667 for each of the ten registered representatives of SWB (in excess of four) who did not continue employment with First Nebraska after the transfer of the business. This provision indicates that a total of $100,000 ($16,667 times a maximum of 6 noncontinuing registered representatives) was paid in effect for SWB's existing staff of registered representatives.
This leaves a balance of $130,000 of the additional consideration effectively unassigned. First Nebraska determined that $129,851.50 of this amount was paid for income which had been already effectively "earned" by SWB in connection with underwriting contracts in process at the time of the transfer of the business. Respondent agrees with First Nebraska's determination, which consists of the following specific *387 items: Great Plains - private placement
$ 29,475.00
Great Plains - public offering
15,778.50
Data Documents - public offering
23,715.00
Brandeis industrial development
bond issue
21,500.00
Nashua industrial development
bond issue
3,333.00
Municipal bond issues
12,130.00
Sanitary and improvement district
bond issues
21,450.00
Church bond issue
1,650.00
Federal agency bonds
820.00
$129,851.50
Petitioner's basic position has been that SWB had earned no income with respect to any of the foregoing uncompleted underwriting contracts since there were substantial contingencies in their completion, and SWB had no fixed right to receive the respective underwriting fees until actual completion. However, the Court of Appeals has held that income was earned by SWB, even though the completion contingencies existed, based upon work which had been done with respect to the contracts prior to their transfer, and the amount "earned" was realized as part of the additional $130,000 paid by First Nebraska for SWB's business. We must, therefore, determine the amount of income so earned and realized. Respondent has determined that the appropriate amounts are those *388 initially determined by First Nebraska, as set forth in the table above. Petitioner has the burden of proving otherwise. We observe initially that the trial record indicates that qualified representatives of First Nebraska made a detailed and rational assessment of the various contracts in process, including the anticipated income, future expenses and degree of completion. Thus, the amounts reflected in the table appear to have a rational foundation. On the other hand, we cannot lose sight of the fact that these amounts were determined unilaterally by the purchaser of the business, which certainly had a vested interest in maximizing the amount of income deemed previously earned by SWB, thereby minimizing its own taxable income upon completion of the acquired contracts. Further diminishing the significance of First Nebraska's computations is the fact that they were not made at the time of execution of the contract to purchase SWB's business (March 9, 1966), but at some time subsequent to the closing of the purchase (April 4, 1966), apparently as late as May(and not finalized until July) of that year. Thus, it is clear that the unidentified $130,000 in question was not an *389 amount negotiated and agreed upon as part of the purchase price for SWB's business, based upon any detailed evaluation by First Nebraska of the contracts in process at the time of entering the contract to purchase. This, of course, relegates First Nebraska's detailed computations to hindsight [2] and leaves open the possibility that the additional $130,000 might have been paid at least in part for intangibles such as goodwill, going concern value, or as petitioner argues, the continued involvement of SWB's three principal operating officers. We turn now to an examination of the various contracts in process as reflected in the First Nebraska evaluation as of April 4, 1966: Great Plains private placement and public *390 offering
First Nebraska's computation was as follows: Private placement: Placement fee (50% of $67,500)
$33,750.00
Less: expenses
1,000.00
32,750.00
90% completion
29,475.00
Public offering: Underwriting fee (50% of $52,500)
26,250.00
Management fee (50% of $8,800)
4,400.00
30,650.00
Less expenses (50% of $19,225)
9,612.00
21,038.00
75% completion
15,778.50
Total private placement and public
offering
$45,253.50
As can be seen, the valuation approach taken by First Nebraska was to start with the anticipated gross income and deduct the estimated costs to complete. The amount derived at this point represents the contract purchase r's break-even point (i.e., the maximum price which it could pay to purchase the contract in process and break even after subsequently completing the contract). This amount must then be reduced to the level which the contract purchaser would be willing to pay in order to be able to complete the contract at an adequate profit, considering the capital investment and the risks that the estimated eventual revenues might not materialize (or that completion costs will exceed the estimates). In computing this latter *391 reduction First Nebraska has used an estimate of the percentage of completion of the contracts at the time of the transfer (90% in the case of the private placement and 75% in the case of the public offering). We believe that this approach is inapposite. The basic question is one of valuation of a partially completed contract. The present value to a potential purchaser, as a percentage of the anticipated future net revenues, is not necessarily related to the percentage of completion of the work on the contract. [3] Thus, for example, a manufacturing contract might be 90 percent complete in terms of labor and materials, but the remaining 10 percent may require a disproportionate period of time (due to unavailability of a key part), or there may be a significant risk of cancellation. Thus, what is most relevant here is not the percentage of completion by SWB, but the determination of present value based upon potential return on investment and risk to the purchaser. [4]
*392 The Great Plains private placement provides a good illustration of this point. The private placement was substantially completed, SWB having received a written commitment from three institutional investors to purchase the entire debt issue. Virtually all of the work was done, and First Nebraska used a 90 percent completion factor in its computation. However, this ignores the critical fact that the debt placement was contingent upon the successful completion of the public offering. As of the April 4 valuation date the public offering was only 50-75 percent subscribed, stock market conditions were weak, and the offering had not yet received required approvals from two regulatory agencies. In our view these contingencies had a material effect on the then present value of not only the public offering contract but the private placement contract, which (although perhaps 90 percent complete) was subject to the same contingencies. Under First Nebraska's computations the two contracts, having a combined estimated net revenue of $53,788, were valued at $45,253.50. This represents a discount of approximately 16 percent. Despite the fact that the public offering and private placement *393 were completed in less than two months from the date of the agreement for transfer of the contracts in process, we believe that, considering the contingencies involved (as referred to in our original opinion) at the time of such agreement, a prudent businessman would not have purchased these contracts at only a 16 percent discount. Considering all of the evidence presented, including the fact that the contracts were in fact completed within a relatively short period, we nonetheless believe that a 25 percent discount represents a more realistic measure of the then present value of the Great Plains contracts. Accordingly, we conclude that of the unidentified portion of the purchase price of SWB's business, $40,341 (75 percent of $32,750 plus 75 percent of $21,038) was paid for the Great Plains private placement and public offering contracts. Data Documents public offering
SWB had been the principal underwriter of a public offering of stock of Data Documents, Inc.At the time of the sale of SWB's business to First Nebraska, the work on this contract had been substantially completed, and the offering was completed by First Nebraska on April 21, 1966, 17 days after the acquisition *394 from SWB. First Nebraska assigned a purchase price to this contract in the amount of $23,715, computed as follows: Estimated gross income
$50,400
Estimated costs to complete
22,500
27,900
85% completion
x 85%
Value at time of purchase
$23,715
This approach is basically the same as that taken with respect to the Great Plains contracts. Here again for the reasons stated above, we disagree with the use of the percentage of completion factor as the measure of the appropriate discount to present value. In determining the value of this substantially completed contract, however, the fact that the contract was completed within 17 days of its acquisition (and within just over a month from the date of the SWB-First Nebraska purchase agreement), is indicative that a relatively small discount to present value would have been appropriate -- unless substantial contingencies existed at the time. An official of First Nebraska testified that the anticipated income from this underwriting contract at the time of acquisition from SWB was "like money in the bank." From our assessment of the record we agree that the contingencies at that point were considerably less significant *395 than those which existed with respect to the Great Plains contracts. Thus, we believe that a discount factor of 15 percent, the discount effectively applied by First Nebraska, although upon a different theoretical basis, is appropriate. Accordingly, we conclude that $23,715 was paid for the Data Documents public offering contract. Brandeis industrial development bond issue
On March 18, 1965, SWB entered into a letter agreement with J. L. Brandeis & Sons, Inc. ("Brandeis"), pursuant to which SWB was to assist Brandeis in arranging for the issuance by Douglas County, Nebraska (through SWB as underwriter) of approximately $2,000,000 in industrial development bonds for the construction of a new distribution center to be leased by the county to Brandeis. On March 29, 1966, the Douglas County Board of Commissioners approved the bond issue and the County entered into a contract with Brandeis and SWB, providing for the issuance of $3,000,000 in bonds through SWB, and setting forth the lease arrangements with Brandeis. On May 23, 1966, SWB and Brandeis entered a letter agreement setting forth the detailed terms of the bond underwriting arrangements, including an underwriting fee *396 of 2-1/2 percent of the $3,000,000 principal amount of the bonds to be issued; 25 percent of this fee was to be paid to a co-underwriter. The underwriting was subsequently completed. First Nebraska computed the value of this contract in process as follows: Estimated gross underwriting income
[5] $65,000
Estimated expenses to complete
22,000
43,000
50 percent completion factor
x 50%
$21,500
We believe that the amount so determined by First Nebraska was unrealistically high in light of the critical fact that as of the date that the purchase price for SWB's business was determined and fixed, March 9, 1966, the proposed Brandeis industrial development bond issue had not even been formally approved by the County, the entity which was to issue the bonds. Although it is likely that some form of informal approval of the project had been obtained at an earlier date (particularly since *397 the original letter agreement between SWB and Brandeis launching the project was signed more than a year earlier), the record does not reflect the extent to which the County was involved and/or committed prior to the formal approval. Under these circumstances we can only conclude that, as of the critical March 9 date, the Brandeis bond transaction was highly contingent, both as to the participation of the prospective issuer and the amount of income which could have been anticipated even if the underwriting were completed. [6]
However, we believe that by March 9, 1966, the arrangements with respect to this particular underwriting had progressed (at least with respect to Brandeis' participation) to such a stage that it had some present *398 value to a prospective purchaser (i.e., First Nebraska) as of that date. In light of all the facts and circumstances to the extent reflected in the record, and weighing heavily the absence of formal participation by the County (which was to be the issuer of the bonds) at the time the purchase by First Nebraska from SWB was negotiated, we conclude that $10,000 was paid for the Brandeis bond underwriting contracts in process. Nashua industrial development bond issue
In the latter part of 1965 and early 1966 SWB held discussions with Nashua Corporation ("Nashua") concerning the financing of a building which Nashua proposed to construct in Omaha. In a February 7, 1966, letter to Nashua, SWB proposed that the financing be accomplished through the issuance of industrial revenue bonds by Douglas County, which would build and equip the building and lease it to Nashua. On March 24, SWB sent Nashua a letter formally proposing a plan for the issuance of $3,500,000 in industrial revenue bonds, with respect to which SWB would receive a placement fee of 1% to 1-1/4%. On March 31, 1966, Nashua replied by letter which contained the following sentence: Confirming our phone conversation, *399 we would like you to proceed as you propose, without, of course, finally committing Nashua Corporation, since we feel we will need an IRS ruling and will need to review the final terms before proceeding. At some point subsequent to the SWB-First Nebraska transfer, an issue of industrial revenue bonds by Douglas County for Nashua was in fact arranged and completed by First Nebraska. First Nebraska determined that the Nashua project had a value of $3,333 at the time of its acquisition from SWB. The facts set forth above clearly show that the Nashua transaction was still in the negotiation stage at the time of its transfer to First Nebraska. There was clearly no firm commitment to proceed by either Nashua or Douglas County. In these circumstances it can hardly be said that First Nebraska purchased a contract in process or that SWB had "earned" any income [7] as a result of its discussions with Nashua prior to the March 9 agreement between SWB and First Nebraska. Accordingly, we conclude that no portion of the consideration paid by First Nebraska represented earned income to SWB with respect to the Nashua financing. *400 Municipal bond issues
First Nebraska prepared a schedule of all of SWB's commitments, as of March 9, 1966, for the underwriting of municipal bonds and sanitary and improvement district bonds, including an estimate of the underwriting fee to be received with respect to each. Included in the list were 30 municipal bond issues, having an aggregate estimated fee income of $78,246. The completion of most, if not all, of these underwritings was contingent upon subsequent approval of the bond issues in elections in the respective issuing jurisdictions. In several instances the bond issues were subsequently defeated in the local elections and the underwritings were cancelled. First Nebraska determined that, considering this significant contingency, the aggregate prospective fee income should be discounted by 85 percent in determining the value at March 9, 1966, i.e., the municipal bond commitments as a group should be valued at 15 percent of the aggregate prospective fee income, or $12,130. This is the amount which it believed the commitments could be sold for as of that date. We consider this approach to be a reasonable and appropriate assessment of the value of the municipal *401 bond underwriting commitments, and accordingly, we conclude that $12,130 was paid by First Nebraska for these commitments as a group. [8]
Sanitary and improvement district bond issues
Included in First Nebraska's list of SWB's underwriting commitments in process as of March 9, 1966, were four sanitary and improvement district ("S.I.D.") bond issues, the estimated aggregate gross underwriting income from which was $104,300. First Nebraska assigned a present value to these commitments, as a group, in the amount of $21,450, computed as follows: Projected gross income
[9] $104,135
Less: expenses
39,783
64,352
33-1/3% completion
$21,450
*402 The resulting value represents approximately 20.5 percent of the estimated potential gross income. Unfortunately, the evidence is somewhat sketchy as to the extent of the contingencies involved in the completion of the S.I.D. bond issues. It appears that the contingencies involved in the requirement of local municipal approvals are not present when the issuing authority is an S.I.D. Petitioner's major argument as to the S.I.D. underwritings is that, except with respect to certain progress payments as to which SWB had already received income prior to the sale to First Nebraska, [10] it was not entitled to the projected underwriting income until actual completion of the underwriting. This, however, is the basic argument which was rejected by the Court of Appeals. Thus, it appears to us that First Nebraska's valuation of the S.I.D. underwriting commitments in the amount of $21,450 (approximately 20.5 percent of the estimated future gross income from such contracts) represents a reasonably conservative estimate of the fair value of such contracts as of March 9, 1966. In any event, petitioner, upon whom rests the burden of proof, has not established otherwise. *403 Church bond issue
Included in First Nebraska's list of purchased contracts in process was a contract between SWB and St. James Catholic Church for the issuance of $150,000 in first mortgage bonds. This contract was valued by First Nebraska at $1,650 (50 percent of estimated net underwriting income, after expenses). However, the record indicates that SWB's written proposal to the Church to handle the underwriting was not made until March 24, 1966, and not accepted by the Church until April 1, 1966. Both of these dates were subsequent to the date of the agreement of sale between SWB and First Nebraska. Thus, no portion of the consideration agreed to be paid by First Nebraska can be deemed to have been for this contract, which was not even in existence at the time of such agreement. Federal Agency Bonds
First Nebraska included in its list of contracts acquired from SWB, the sale of certain Federal agency bonds, which it contends were completed prior to March 9, 1966, at a net profit, after expenses, of $820. An officer of First Nebraska testified that this sale was completed and the income earned by SWB prior to the March 9 sale to First Nebraska (although the fee *404 income was not received until the settlement date of the bond sale on April 4, 1966). Petitioner, upon whom rests the burden of proof, has failed to establish otherwise. Accordingly, we conclude that $820 of the total consideration paid by First Nebraska represented payment for the right to income from the Federal agency bond sales. The foregoing determinations may be summarized as follows: Amounts paid by First Nebraska for contracts in progress and "earned" by SWB
Great Plains private placement
and public offering
$40,341
Data Documents public offering
23,715
Brandeis industrial development
bond issue
10,000
Nashua industrial development
bond issue
0
Municipal bond issues
12,130
Sanitary and improvement
district bond issues
21,450
Church bond issue
0
Federal agency bonds
820
$108,456
Accordingly, we conclude and hold that of the total sum paid by First Nebraska to SWB for the purchase of SWB's business, $108,456 represents payment for contracts in process and income earned by SWB in partially completing such contracts prior to the sale to First Nebraska. Decision will be entered under Rule 155.
Footnotes
1. All section references herein are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
2. In this connection we observe that the sum of all of the various items of "purchased income," all of which were subject to separate computations based on the status of each contract in process, happens to total an amount just $148.50 short of the $130,000 unidentified portion of the purchase price. This might tend to indicate that the individual computations may not have been bona fide, but merely set up so as to absorb in total the $130,000 amount in question.↩
3. Percentage of completion does, of course, bear on the purchaser's future completion costs, but First Nebraska in its computations directly estimates and deducts these costs. ↩
4. Of course, the percentage of completion is relevant in determining the extent of income "earned" by SWB prior to the sale. For example, a contract for services to be performed may have a value and may be sold for that amount prior to the performance of any services. In such case the seller would not have "earned" any income under the contract even though he received consideration for its transfer. In the instant case we do not believe that the amounts which we have determined were paid for transfer of the respective contracts in question in any case exceeded what may be deemed "earned," measured by percentage of completion.↩
5. We are unable to determine from the record how this amount was computed. It would appear that the gross underwriting income to SWB under the terms of the May 23 letter agreement would be $56,250, or 75 percent of the gross fee of $75,000 (2-1/2 percent of $3,000,000).↩
6. In this connection we note that the original 1965 letter agreement with Brandeis provided for issuance of only approximately $2,000,000 in bonds with no underwriting fee specified. The $3,000,000 principal amount (upon which the fee would be based) does not appear in the record until the March 29, 1966, agreement, and the allocation of 25 percent of the fee to another underwriter does not appear in the record until the May 23, 1966, agreement.↩
7. While the amount of income deemed earned may be determined, at least in part, by reference to the percentage of completion, we do not believe that time spent seeking new business and negotiating an underwriter's contract should be deemed a portion of the earning process associated with "completion" of a contract--at least until the prospective transaction reaches a more definite stage than was the case here. Thus, even if the "relationship" which SWB had established with Nashua, as a potential↩ client, could be deemed to have had a value which was paid for by First Nebraska, the amount paid would be in the nature of consideration for goodwill or business contacts rather than a realization of "earned" income by SWB.
8. On brief petitioner argues that as to several of the underwriting commitments listed in First Nebraska's schedule, there is no evidence in the record (other than the schedule itself) to establish that such commitments were actually in effect as of March 9, 1966. However, to the extent that the record is lacking in this regard the shortcoming befalls petitioner, upon whom rests the burden of proof herein.↩
9. This total used in First Nebraska's computations differs slightly from the correct total of $104,300, due to the erroneous inclusion of a projected fee of $2,635 from a municipal bond underwriting (included in the total for that category, previously discussed) in lieu of a projected fee of $2,800 from an S.I.D. underwriting which was erroneously excluded.↩
10. Petitioner appears to imply that the progress payments already received by SWB with respect to some S.I.D. underwritings prior to the transfer of the contracts to First Nebraska were included in First Nebraska's schedule of projected future↩ income from such underwritings. However, petitioner has not shown the extent to which First Nebraska's future gross income estimates are erroneous in this respect. The schedule prepared by First Nebraska purports to include only future projected gross income.